UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                         :

LILLIAN GANCI, et al.                     :                04 Civ. 1346 (RJH)
                                           :

                Plaintiffs,        :
                                         :

             -against-          :           **MEMORANDUM OPINION**
                                         :

NEW YORK CITY TRANSIT AUTHORITY,  :
                                         :

                Defendant.       :
                                         :
------------------------------------------------------------x

       Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 against the New York

City Transit Authority "NYCTA"), both individually and on behalf of those similarly

situated, alleging that the manner in which the NYCTA provides refunds for discontinued

transit tokens violates the Fifth Amendment.[1]  Defendant NYCTA is a public benefit

corporation created by the New York State Legislature to operate New York City's

transit system, including but not limited to its subways and buses, pursuant to the New

York Public Authorities Law § 1200, *et seq*.  In order to remedy the alleged constitutional

violation, plaintiffs ask the Court for declaratory and injunctive relief, as well as costs

and attorneys' fees.

       By notice of motion dated May 24, 2004, defendant moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  The NYCTA

has identified a number of reasons it believes plaintiffs' Fifth Amendment claim fails as a

matter of law, including because (i) plaintiffs have not alleged an economic injury and

therefore lack standing; (ii) the decision to phase out tokens is a non-justiciable

---

[1] Plaintiffs also bring a pendant state law claim for "money had and received".  (Compl., ¶¶ 21-24).

administrative decision; (iii) tokens are not protected property under the Fifth Amendment; and (iv) the NYCTA's refund procedure does not constitute a taking and is otherwise constitutional. Plaintiffs opposed the motion, and also moved to amend their complaint to assert a Fourteenth Amendment claim. Oral argument on all motions was heard on March 22, 2005; on March 31, 2005, the Court issued an order granting the motion for judgment on the pleadings and denying the motion for leave to amend. The basis for the Court's ruling is set forth below.

## I.     Background

When considering a motion for judgment on the pleadings, district courts should not stray beyond "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). However, where factual background is provided as "illustrative reference," and not thereafter relied upon as a "ground for decision," reviewing courts are free to look outside the complaint. *Id*. This Court will do so in order to provide some context.

The first of New York's subway lines opened on October 27, 1904, and for the next 44 years commuters paid a nickel for the privilege of riding. Perez-Pena, Richard, *Subway Token, Currency of the City, Dies at 50*, N.Y. Times, March 15, 2003, at B1; s*ee also* http://www.nycsubway.org/ (last visited February 2, 2005). In 1948 the fare increased to $.10, forcing the transit authority to replace or modify entrance turnstiles to accept only dimes (technological limitations prevented turnstiles from accepting both nickels and dimes). *Subway Token, Currency of the City, Dies at 50,* at B1. Five years later, in 1953, the fare was set to rise again, this time to $.15. Rather than modify the

turnstiles to accept nickels, dimes and perhaps also quarters, the transit authority introduced the token.

The original token was a small disc with the letters "NYC" in the middle and the "Y" cut out. This token lasted 17 years, through multiple fare increases, before being replaced by a larger "Y" cutout token in 1970, which itself was retired in 1980 in favor of a solid brass token. *Id.* Next in line was the "bulls-eye" token, introduced in 1986, and known for its distinctive lighter-colored center. In 1995 the token took its final form, a simple design with a pentagonal cutout in the center. *Id.* Of course, subway fares were increased more than five times from 1953 to 1995, which means that tokens were not replaced after every fare increase. The New York Times describes a sort of cat-and-mouse game leading up to increases:

> Each fare increase over the last five decades has been accompanied by a bluffing game by the transit system as it sought to prevent hoarding of tokens at the pre-increase price. Each time, officials said they would either introduce a new token or bring back a former one, but just as often, they announced at the last moment that the token would not change.

*Id.* In this way, the NYCTA was frequently able to avoid the cost of designing and producing millions of new tokens when fares increased.

But that is not to say that a token-based infrastructure was inexpensive to maintain. Tokens had to be transported, recovered, and counted, and were also prone to counterfeit. For these reasons, "transit officials . . . long looked forward to the day when most of their business with riders would involve exchanges of electrons, not metal and paper." *Id.* That day came in 1994 with the introduction of the "MetroCard" electronic fare system. MetroCards have several advantages over tokens. For one, they do not have to be counted, sorted or collected. Another advantage is that the cards can be sold in

"unlimited use" daily, weekly and monthly blocks of time, which allows customers to reduce the average price per ride.

Although MetroCards were slow to catch on, by early 2003 they had captured a significant share of gross fare purchases, prompting the NYCTA to announce that tokens would be completely discontinued by the end of the year.  *Id.*[2]  This decision was communicated to customers through various media, including through postings on NYCTA property, in newspapers announcements, and by both radio and television news broadcasts.  (*Id.*; *see, e.g.* Ex. 3 to Answer).   Luddite commuters were thus faced with a choice:  tokens could be used before May 4, 2003 on subways, or before December 31, 2003 on buses.  After May 4, 2003, tokens could be redeemed for their purchase price pursuant to a token refund procedure.

That refund procedure is the subject of this suit.  In order to clarify the mechanics of the procedure, the Court invited the parties to submit additional evidence on the topic. Defendant responded with two affidavits.  The first is sworn to by Carol Noymer, the NYCTA's attorney of record in this case, and generally outlines the refund procedure as it stood in 1995.  The second is sworn to by Carolyn Lewis, the Administrative Manager in the NYCTA's Comptroller's Treasury Business Office, who is responsible for the oversight and administration of the refund procedure.  Plaintiff did not submit evidence in response to the Court's request, but stipulated at argument that the current refund procedure is as set forth in defendant's affidavits.

In 1995, when the NYCTA last changed tokens, customers were allowed to exchange an old token worth $1.25, along with a quarter, for a new one worth $1.50.

---

[2]  According to the MTA's "Comprehensive Annual Financial Report for the Year Ended December 31, 2002," *available at* http://www.mta.nyc.ny.us/mta/investor/pdf/2002annualreport_complete.pdf (last visited March 8, 2005), by the end of 2002 "only 9% of . . . [transit customers] still use[d] tokens."

(March 18, 2005 Aff. of Carol Noymer, ¶ 4).  For the first six weeks after the
introduction of the new token, customers wishing to make an exchange could do so at any
token booth.  (*Id.*)  Thereafter, customers wishing to obtain refunds for fewer than 20
tokens were required to travel to NYTCA's Brooklyn headquarters or its Lost Property
Office at the 34th and 8th Avenue station in Manhattan.  (*Id.*, ¶ 5).  Customers wishing to
refund more than 20 tokens could only go to the Brooklyn headquarters.  (*Id.*).

Following the events of September 11, 2001, the NYCTA instituted tighter
security precautions at all its facilities.  At its Brooklyn headquarters, for example, non-
employees had to be escorted at all times.  (March 17, 2005 Aff. of Carolyn Lewis, ¶ 4).
As a result, because the token refund desk was located on the second floor of the
Brooklyn building, refund-seekers needed an escort, which meant that they needed to call
ahead and make an appointment.  (*Id.*).  This is the procedure that was in effect at the
time that tokens were discontinued in 2003, and is also the procedure described in
plaintiff's complaint, which was filed in February 2004.

In September 2004 the procedure changed yet again, this time because the
NYCTA moved its Comptroller's Office from Brooklyn to an address in lower
Manhattan.  (*Id.*, ¶ 5).  After the move, the NYCTA was able to drop the requirement that
token holders call ahead because the refund desk was situated in a manner that did not
allow access to the rest of the building.  (*Id.*).  This is the procedure as it stands today –
anyone seeking to redeem tokens can do so by traveling to 2 Broadway in lower
Manhattan from Monday to Friday between the hours of 9:00 a.m. and 4:00 p.m.  (*Id.*, ¶
6).  No advance notice is required, and cash redemptions are offered if the value of the
refunded tokens is less than $30.  Higher amounts are paid by check.  (*Id.*).

Thus, the allegation in plaintiff's complaint that customers seeking a refund must "make an appointment by telephone and appear in person at NYCTA headquarters at 370 Jay Street, Brooklyn, New York", is no longer correct. (Compl., ¶ 15). In any case, plaintiffs still maintain that the refund procedure is "inadequate . . . in that it is extremely impractical . . . to avail [oneself] of [the] procedure in [light] of the time and cost involved." (Compl., ¶ 16). According to plaintiffs, the cost of the refund procedure is especially burdensome when compared with "the value of the refunds to which [customers] are entitled." (*Id.*). The crux of their claim appears to be that their tokens have been "taken" by the state because the "value" of the discontinued tokens is reduced by the relatively high cost of recovery.[3]

Defendant, of course, disagrees with this characterization, noting that while the procedure may involve a "slight inconvenience", it does not violate the Fifth Amendment. (*See, e.g.,* Mot. to Dismiss, pp. 12-21). The Court now turns to that question.

## II.   Discussion

"In deciding a Rule 12(c) motion, [courts] apply the same standard as [is] applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) (citation and quotation marks omitted). Accordingly, a complaint should not be dismissed under Rule 12(c) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In other words, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the

---

[3] At argument on the motion plaintiffs' counsel stated that each named plaintiff held five to seven tokens.

claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

### A. The Takings Clause

The Takings Clause of the Fifth Amendment – made applicable to the states through the Fourteenth Amendment – prevents "private property" from being "taken for public use, without just compensation." U.S. Const. amend. V. Generally speaking, takings claims arise in one of two ways. "The clearest sort of taking," commonly referred to as a "physical" taking, "occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). A second type of taking, known as a "regulatory" taking, can arise where "government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Palazzolo,* at 617. Regulatory takings are based on the principle that "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922).

Whichever form the alleged taking assumes, to succeed in establishing a constitutional violation claimants must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation. *Frooks v. Town of Cortlandt*, 997 F.Supp. 438, 452 (S.D.N.Y. 1998); *Port Chester Yacht club, Inc. v. Iasillo,* 614 F.Supp. 318, 321 (S.D.N.Y.1985). In its motion to dismiss, defendant argues that – as a matter of law – plaintiffs' claim does not meet the first and second prongs of that test. The Court will limit its discussion accordingly, bearing in mind that "a party challenging governmental action as an unconstitutional taking bears a

substantial burden." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) (citation omitted). Before doing so, however, a final point of clarification is in order.

Plaintiffs have failed to state their Fifth Amendment claim with precision.[4] In their opposition to defendant's motion, plaintiffs ask for a "judgment . . . declaring that [the] NYCTA's refund procedure violates the Fifth Amendment of the United States Constitution." (Opp., p. 16; Compl., ¶ 20). Elsewhere in the complaint, plaintiffs allege that certain NYCTA past acts constituted a Fifth Amendment taking, and characterize the current refund procedure as "inadequate". (*See, e.g.*, Compl., ¶¶ 13, 16). Reading plaintiffs' submissions together, the Court will construe their claim as alleging that the refund procedure constitutes a regulatory taking in violation of the Fifth Amendment. Thus, plaintiffs' claim is as follows: (i) purchasers of transit tokens have a right to recover what they paid for those tokens; (ii) this right constitutes a constitutionally protected property interest; and (ii) that property is "taken" by the refund procedure because it is an "inadequate" method of recovery. With that construction in mind, the Court turns to the merits of the claim.

### 1. What is the Scope of Constitutionally Protected Property?

As noted, *supra*, the first step in analyzing a taking claim is to ask whether the claimant has a cognizable property interest that has been jeopardized by governmental action. *See Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992).[5] The Constitution itself

---

[4] For example, plaintiffs state in their opposition to defendant's motion that "the Complaint does *not* allege that NYCTA's elimination of tokens violated [their] rights." (Opp. Memo., p. 16 (emphasis in original)). Yet paragraph 13 of the Complaint claims that: "[t]he phasing out of tokens on NYTCA's subways and buses constituted a taking of private property for public use under the Fifth Amendment of the United States Constitution." (Compl., ¶ 13). Assuming that the "phasing out" and "elimination" of tokens are different ways of describing the same process – linguistically, a fair assumption – these two statements appear to contradict one another.

[5] There is no question that – whatever its form – the alleged taking in this case involved government action of some sort because, pursuant to New York's Public Authorities Law, the NYCTA undertakes

neither creates nor defines the universe of property interests protected by the Fifth

Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Thus, in *Roth* and its

companion case *Perry v. Sindermann*, 408 U.S. 593 (1972), the Supreme Court took upon

itself the task of giving "some meaning" to the scope of constitutionally protected

property. *Roth,* at 572. Although the claims in both *Roth* and *Sindermann* arose under

the Due Process Clause of the Fourteenth Amendment, the Supreme Court has

consistently applied for Takings Clause purposes the standard it developed in *Roth* for the

establishment of constitutionally protected property. *Phillips v. Washington Legal*

*Foundation*, 524 U.S. 156, 164 (1998); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986,

1001 (1984); *Webb's Fabulous Pharmaceuticals, Inc., v. Beckwith*, 449 U.S. 155, 161

(1980). Thus, *Roth* and its progeny are instructive in defining "property" for purposes of

the Takings Clause, although it is not necessarily the case that the term "property" in the

takings context and the term "property" in the due process context are coextensive.[6]

---

"governmental action" whenever it adjusts fares, sets refund procedures, or otherwise modifies the rights of token holders. *See* New York Public Authorities Law § 1202(2) (2004) ("[The NYCTA] shall be regarded as performing a governmental function in carrying out its corporate purpose and in exercising the powers granted by this title.").

[6] Indeed, the Court is mindful of the fact that Justice Breyer has suggested that "property" for Due Process purposes may be different than "property" for purposes of the Takings Clause. *Eastern Enterprises v. Apfel*, 524 U.S. 498, 557 (1998) (*Breyer, J., dissenting*) ("Nor does application of the Due Process Clause automatically trigger the Takings Clause, just because the word 'property' appears in both. That word appears in the midst of different phrases with somewhat different objectives, thereby permitting differences in the way in which the term is interpreted."). In any case, several commentators have observed that the Supreme Court's treatment of the word "property" in the Takings Clause context is anything but consistent. *See, e.g.,* Andrea L. Peterson, *The Takings Clause: In Search of Underlying Principles Part I – A Critique of Current Taking Clause Doctrine*, 77 Cal. L. Rev. 1299, 1308-1317 (1989) ("The Supreme Court's takings cases . . . leave the proper definition of property in considerable disarray."); Leonard Kreynin, *Breach of Contract as a Due Process Violation: Can the Constitution Be a Font of Contract Law?*, 90 Colum. L. Rev. 1098, 1106 (1990) ("While it is conceivable that the term 'property' has varying meanings depending on the constitutional provision in question, this is not a natural reading of the document."). Whatever the merits of that debate, it is clear that the *Roth* framework is applicable at the outset to both takings and due process claims, and the Court will proceed accordingly. *Phillips*, 524 U.S. 156, 164 (applying *Roth* to takings claim); *Monsanto*, 467 U.S. 986, 1001 (same); *Beckwith*, 449 U.S. 155, 161 (same).

At issue in both *Roth* and *Sindermann* was whether employees of public universities had property interests in their continued employment sufficient to warrant Fourteenth Amendment due process protection. *Roth,* at 564; *Sindermann,* at 593. At the outset, the *Roth* Court made it known that "property" is not a static concept. To the contrary, as the Court observed, "property" is a "broad and majestic term[] . . . among the [g]reat [constitutional] concepts . . . left to gather meaning from experience." *Roth,* at 571 (citation and internal quotation marks omitted). For that reason, the Court announced that it had "fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights"; indeed, said the Court, "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," although "the range of interests protected . . . is . . . [not] infinite." *Roth,* at 570-72. But where does the boundary lie, and how should it be identified?

The answer, according to the Court, is that property interests must rest on some "legitimate claim of entitlement," as distinguished from a mere "abstract need or desire" or "unilateral expectation" of the claimed interest. *Roth,* at 577. Of course, because such entitlements cannot stem from the Constitution itself, they must be traceable to some "existing rule[] or understanding[] that stem[s] from an independent source such as state law." *Id*. Applying this principle, the Court found that the *Roth* claimant had no entitlement to continued employment because he could not demonstrate an "independent source" for that entitlement, which left him with a mere "unilateral expectation." *Roth,* at 578. The claimant in *Sindermann*, by contrast, alleged that he was employed pursuant to an implied long-term contract – a relationship roughly akin to tenure – and therefore

stated a "legitimate claim [to an] entitlement" in his continued employment, although the Court did not rule on the merits of his claim. *Sindermann,* at 602 n.7.

The Supreme Court has not since limited the universe of independent sources, instead leaving lower courts to define the range of constitutional property interests within the "positivist" framework of *Roth.*[7] These courts have been anything but consistent. Most have struggled to square *Roth's* expansive view of "property" with the Court's admonition that "the range of interests protected . . . is not infinite". *Roth*, at 570. Before addressing the efforts of the Second Circuit in that direction, and in order to provide that discussion with some focus, the court will endeavor to identify the source of the alleged protected property interest at stake in this case.

### 2. What is a Token?

Plaintiffs have failed to identify the "independent source" that would establish a protected property interest in this case. Instead, plaintiffs begin their discussion by alleging that, whatever property is at stake here, it is *not* based on a contract with the state. (Opp., p. 19 (noting that "the present case is not based on a breach-of-contract theory.")). Rather than following that disclaimer with their view of what the claimed interest *is* based on, plaintiffs make two conclusory assertions: first that this case is "based solely on the onerous requirements that NYCTA has placed on them in order to obtain the refunds to which they are entitled," and second that they "only seek just compensation for property for which they *have paid* and *whose value was eliminated*." (*Id*.) (emphasis in original).

---

[7] *See generally*, Kreynin *supra* note 6, at 1098-1117.

But what, exactly, is the "property for which [plaintiffs] have paid"?  In one sense, of course, it is the token itself.[8]  In a more accurate sense, though, the alleged property at stake is whatever bundle of rights is conferred upon token holders.  Plaintiffs must sense the truth in this, for they allow that a token is the same as "a ticket to a Broadway show," arguing that both "clearly ha[ve] value."  (*Id.*, p. 16).  Certainly, a ticket to a Broadway show confers upon its holder certain rights, as does a ticket for passage on an Atlantic steamer, or a New York City subway.  All are therefore in the nature of a contract.[9]

This conclusion is supported by at least two New York decisions, both of which hold that the relationship between transit customers and a transit authority is in the nature of a contract.  In *D'Angelo v. Triborough Bridge and Tunnel Authority*, 106 A.D.2d 128 (N.Y. App. Div. 1st Dept. 1985), the First Department of the New York Appellate Division observed that when a customer pre-pays for use of bridge and tunnel tolls, he essentially enters into a contract:

> [S]ince plaintiff purchased his book of tickets in advance, he exchanged the present use of his money for a promise of future service and for the convenience of using tickets rather than cash each time he obtained the service, while [defendant] gained the benefit of present value and use of the money transferred.

---

[8]  The NYCTA seems to sense the problem with this conceptualization, arguing that a token "is simply an object with no intrinsic value that allowed its holder to enter the NYCT [transportation] system," and noting that the holder's "sole expectation . . . was to secure passage on either a subway or a bus."  (Def. Memo., p. 13).  Defendant further notes that "[a]ny assumption by plaintiffs that the purchase of a subway token entitled them to passage on New York City's transit system indefinitely is belied by common sense" because "repeated fare increases since 1953 and multiple changes in token format [have rendered] prior tokens obsolete" in the past.  (*Id.*, pp. 13-14).

[9]  In the interest of thoroughness, the Court notes that a ticket might also take the form of a license, such as where the right conferred upon the holder is limited to the right not to be sued for some conduct.  *See, e.g.*, *Tyson & Bro.-United Theatre Ticket Offices v. Banton*, 273 U.S. 418, 432 (1927) ("A theater ticket may be in the form of a revocable license or of a contract.").  Whatever the legal difference between a contract and a license – and the court makes no judgment on this point – the issue in this case remains the same: whether the rights conferred upon token holders rise to the level of constitutional property.

*D'Angelo*, at 130. Although the *D'Angelo* court rejected the notion that the $.75 purchase price conferred upon a ticket purchaser an *absolute* right of passage at that price, it accepted the proposition that the relationship is in the nature of a contract. *Id.*, at 131. Likewise, in *Levine v. Long Island R. Co.*, 38 A.D.2d 936 (N.Y. App. Div. 2nd Dept., 1972), the Second Department held that when the MTA discontinued the use of prepaid "ten trip tickets" for use on the Long Island Railroad, it did not impair the "obligation of contracts (U.S. Const. Art. I, s 10)" because "[t]he right of the State to alter a rate or fare schedule is inherent and contracts at certain rates or fares are made subject to this power to change the terms of the contract." *Id.*, at 938.

Although this Court sees no reason to view the relationship between token purchasers and the NYCTA differently, it is worth noting that one New York court has expressed doubts about the existence of a contractual relationship. In *Leeds v. MTA*, the First Department considered whether a commuter was entitled to a refund of $15.00 for token purchases where he claimed that the MTA "provided persistently late train service and permitted unsanitary, unsafe, and overcrowded conditions on its trains." *Leeds v. MTA*, 117 Misc.2d 329 (N.Y. App. Div. 1st Dep't 1983). In attempting to identify the legal relationship between the parties, the Court entertained but ultimately rejected the notion that token purchasers enter into an implied contract with the MTA:

> The essence of plaintiff's lawsuit is that the Transit Authority . . . breached its implied contract to transport him arising from the sale and purchase of a token, and that there is no specific statute exempting the defendant from ordinary, common-law contract liability. . . . At the outset, it is at once apparent that however the relationship between the Transit Authority and the subway rider may be defined, it does not easily fit within the mold of familiar contract concepts. Of course one may recover what has been paid where there is a substantial failure of performance by the contracting party, but in this instance the consideration charged the user bears no logical relationship to the cost of a facility operated "not for gain but for service and convenience."

*Id.*, at 329-330 (citation omitted). The *Leeds* court clearly felt that there was inadequate consideration to support a contract, and therefore no "private obligation" between the MTA and the claimant sufficient to warrant individual relief. *Id.* In any case, even if there was an enforceable contract between riders and the MTA, the court indicated that it would refuse to "embroil" itself in the administration of the transit system, even though plaintiff sought recompense for "disturbing and even dreadful conditions which are matters of common knowledge". *Id.* (citations and quotation marks omitted).

Having considered the foregoing cases, the Court is of the opinion that the better view for present purposes is expressed in *D'Angelo* and *Levine*, where the courts assumed the relationship to be contractual in nature. To be sure, the contract at issue here is neither written nor oral – it is implied. "Implied contracts normally arise in situations where," as here, "there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." 6 Fletcher Cyclopedia of Private Corp. § 2580 (2004). In *Sindermann,* the Supreme Court observed that not every term of a contract must be reduced to writing, *Sindermann*, at 602 (university's adherence to a particular pattern of conduct could create an expectation of continued employment in employees who lacked tenure), and the Second Circuit has recognized that implied contracts can give rise to constitutional property interests. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991) (concluding that New York's recognition of an implied contract between a university and its students provided a basis for constitutionally protected property interest).

As noted, *supra*, plaintiffs' claim that the refund procedure constitutes a regulatory taking. Thus, assuming that their implied contract with the NYCTA gives

them the right to a refund at least under certain circumstances, the question is whether that right qualifies as "property" for purposes of the Fifth Amendment.

### 3. Can Contract Rights Ever Give Rise to Constitutional Property Interests?

As a threshold matter, it is clear that contract rights can give rise to constitutional entitlements. Indeed, in both *Roth* and *Sindermann*, discussed *supra*, the Supreme Court held that public employment contracts give rise to constitutional property interests under certain conditions. Likewise, in *Lynch v. United States,* 292 U.S. 571 (1934), the Court held a government contract to be the source of a protected property interest for purposes of the Takings Clause. The claimant in *Lynch* purchased a war insurance policy from the United States, effectively lending money to the Government in exchange for future payment on the value of the policy at the time of the insured's death. *Lynch*, at 574-75. Soon thereafter, Congress abrogated by legislation all such policies, and the policyholders filed a Fifth Amendment claim. In allowing the claim to proceed, the *Lynch* Court observed that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch*, at 579.

It follows from *Lynch* that contracts can be "independent sources" within the *Roth* framework. At the same time, it is apparent – in this Circuit at least – that not *all* contracts between the government and a private party create property interests that warrant constitutional protection, at least not in the context of the Due Process Clause. *S&D Maintenance v. Goldin*, 844 F.2d 962, 966-67 (2d Cir. 1988). As the Seventh Circuit noted in *Mid-American Waste Systems, Inc. v. City of Gary, Ind.,* 49 F.3d 286, 289 (7th Cir. 1995), several "[c]ourts have resisted the implication that every government-contract case belongs in federal court," including the Second, Third and Ninth Circuit, all

of which have held that "only contracts creating a special status (employment, for example) count as 'property'". *Id.* (citing *S & D Maintenance,* 844 F.2d 962); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1397-1400 (3d Cir. 1991); *San Bernardino Physicians' Services Medical Group v. County of San Bernardino,* 825 F.2d 1404 (9th Cir. 1987)).  Under the law in these circuits, contracts that do not create a special status "do not create property and therefore must be enforced in state court." *Id*. *But see Mid-American*, at 289; *T.A. Moynahan Properties, Inc. v. Lancaster Village Co-Op, Inc.,* 496 F.2d 1114 (7th Cir.1974) (contract with municipality to manage public cooperative housing gives rise to constitutional property interest); *Adams v. U.S.*, 391 F.3d 1212, 1221 (Fed. Cir. 2004) ("When the Government and private parties contract, as in *Lynch,* the private party usually acquires an intangible property interest within the meaning of the Takings Clause in the contract."); *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1431 n.8 (11th Cir. 1998) ("[I]nsurance contracts can be property subject to an unconstitutional taking under the Fifth Amendment"); *Waller v. Southern Illinois University,* 125 F.3d 541, 542 (7th Cir. 1997) ("[A] public law school . . . breaks its contract to admit or readmit a student deprives the student of 'property'").

The Second Circuit clarified its view on this subject in *S&D Maintenance*, 844 F.2d 962.  Plaintiff S&D entered into a series of contracts with New York City to maintain parking meters in the City.  *Id*., at 964.  When the City Comptroller refused to authorize payment of several invoices that had been certified by other City officials, S&D filed Article 78 proceedings to compel payment.  The City ultimately terminated all of S&D's contracts without a hearing and without paying the outstanding invoices.  *Id*., at 965.  In response, S&D filed suit in federal court, alleging that the City's acts deprived it of both property and liberty interests without due process, in violation of the Fourteenth

Amendment. The district court granted the City's motion for summary judgment on all federal claims, and the case was appealed.

The Second Circuit framed the question on appeal as whether S&D had "a contractual right giving rise to a 'legitimate claim of entitlement' and thus a constitutionally protected property interest under *Roth*." *Id*., at 966. Although noting that "every enforceable contract right can be said to be an 'entitlement'" as long as "a state provides judicial remedies for the enforcement of contracts," the Court explained:

> If the concept of "entitlement" were this expansive, federal courts could be asked to examine the procedural fairness of every action by a state alleged to be in breach of its contracts. . . [T]he doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns, and we seriously doubt that *Roth* and its progeny portend such a result.

*Id*., at 966. The court then observed that the property interest attendant to "an ordinary commercial contract with a state" is "qualitatively different from" the property interests afforded constitutional status by the Supreme Court in the past, which have included (i) welfare benefits;[10] (ii) social security benefits;[11] and (iii) tenured status in public employment.[12]

Relying on this distinction, the Second Circuit announced that property interests having contracts as their source are protectable by the Due Process Clause *only* where "protection is sought in connection with a state's revocation of a *status*." *Id*. (emphasis in original).[13] According to the court, "status" is "an estate within the public sphere

---

[10] *Goldberg v. Kelly*, 397 U.S. 254 (1970).

[11] *Matthews v. Eldridge*, 424 U.S. 319 (1976).

[12] Both *Roth* and *Sindermann* involved claims to tenured status as a public employee.

[13] In reaching this conclusion, the Second Circuit did not address or otherwise distinguish the *Lynch* Court's more expansive view that "[v]alid contracts are property." *Lynch*, at 579.

characterized by a quality of either extreme dependence . . . or permanence . . . or sometimes both." *Id.* Status is to be distinguished from contractual interests that "are not associated with any cognizable status of the claimant beyond" some "temporary" relationship with a government entity. *Id.*, at 967; *see also Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 31 (2d Cir. 1994) (rejecting due process claim where it was based on "the breach of an ordinary contract"); s*ee also San Bernardino Physicians' Services Medical Group v. County of San Bernardino,* 825 F.2d 1404, 1410-11 (9th Cir.1987) ("[T]he farther the purely contractual claim is from an interest as central to the individual as employment, the more difficult it is to extend it constitutional protection without subsuming the entire state law of public contracts"); *cf. Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 783 (2d Cir.) (recognizing doctor's constitutionally protected property interest in becoming Chief Resident); *Branum v. Clark,* 927 F.2d at 705; *J.O.M. Corp. v. Department of Health,* 697 F.Supp. 720, 724-25 (S.D.N.Y.1988) (where state regulations required that a hearing be held prior to disqualification of plaintiff from federally funded program, plaintiff had protectable property interest in receiving hearing).

The question for this Court is whether plaintiffs' implied contract with the NYCTA gives rise to a constitutionally protected property interest for purposes of the Takings Clause.

### 4. Does the Implied Contract Give Rise to a Protected Property Interest?

Having considered the source of plaintiffs' claim in this case, the Court finds that plaintiffs' right to a refund, or to a particular refund procedure, stems from a *routine* contract between a provider of services and its customers, analogous to other commercial arrangements in which funds are advanced prior to the provision of a service. *D'Angelo*, 106 A.D.2d at 130; *Levine,* 38 A.D.2d at 138. The Second Circuit has repeatedly held

that such routine commercial contracts do not give rise to protected property interests in the Due Process context. *See, e.g.*, *Local 342, Long Island Public Service Employees, UMD, ILA, ALF-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1193-94 (2d Cir.1994) ("the type of interest a person has in the enforcement of an ordinary commercial contract often 'is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection.'") (*citing S & D Maintenance,* 844 F.2d at 966); *see also Martz,* 22 F.3d at 29-30. The Court sees no reason distinguish this case simply because it is based on a takings claim.

In any case, the refund procedure does not induce in token holders anything approaching a "quality" of dependence. Plaintiffs' claims, at best, are based on a right to redeem approximately $10.00 worth of tokens – not an insignificant amount but hardly equivalent to an employment contract or benefit on which a claimant's livelihood depends. Moreover, the New York Legislature has granted the NYCTA broad discretion to modify the terms of its contract with riders, including by:

> [M]ak[ing], amend[ing] and repeal[ing] rules governing the conduct and safety of the public as it may deem necessary, convenient or desirable for the use and operation of the transit facilities under its jurisdiction, including without limitation *rules relating to* the protection or maintenance of such facilities, the conduct and safety of the public, *the payment of fares or other lawful charges for the use of such facilities*, the presentation or display of documentation permitting free passage, reduced fare passage or full fare passage on such facilities and the protection of the revenue of the authority.

New York Public Authorities Law § 1204(5-a) (2004) (emphasis added). Such broad discretion – which clearly allows the NYCTA to regulate its fare structure – is simply not consistent with a protected property interest under *either* the Due Process or Takings Clause.

Indeed, in *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41 (1986), the Supreme Court held that no taking occurred because the legal rights the claimants allegedly lost were not "vested", and could therefore be modified at any time.  As the Court explained:

> [T]he "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. . . . The [termination] provision [at issue] constituted neither a debt of the United States . . . nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium. . . . [T]he provision was simply part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare. . . . [Thus, it] did not rise to the level of "property."

*Bowen,* at 55 (citations omitted); *see also S&D Maintenance,* 844 F.2d at 968 (finding no clear entitlement to prompt payment because the contract vested the municipal official with the discretion to withhold interim payments); *Story*, 978 F.2d 60, 63 (2d Cir. 1992) ("Having enacted a statute that created . . . a right, . . . the legislature retains the power to enact new legislation altering or eliminating the right, and that elimination does not contravene the Due Process or Takings Clauses of the Constitution.").  More generally, anytime a state statute, regulation, or contract vests in the state significant discretion over the continued conferral of a benefit, "it will be the rare case that the recipient will be able to establish an entitlement to that benefit."  *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2nd Cir. 1991).  This is simply not one of those "rare cases."

For all of these reasons, the Court finds that the rights at issue here are not "property" within the meaning of the Takings Clause, and therefore holds that plaintiffs have failed to state a claim for which relief can be granted.

**B. Does the Refund Procedure Constitute a Taking?**

As an independent ground for dismissal, defendant argues that – even if there is a protected property interest at stake here – there has been no actual or regulatory taking. Because plaintiffs do not – and cannot – contend that the refund procedure constitutes an actual taking, the Court will consider the refund procedure in light of the standard for establishing a regulatory taking.

A party challenging governmental action as a regulatory taking bears a substantial burden. *See United States v. Sperry Corp.,* 493 U.S. 52, 60 (1989). Indeed, "a taking is less likely to be found when the challenged interference with a property interest 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good,' than when the interference entails a physical invasion of the property by the government." *Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir. 1984) (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978)).

As the Second Circuit has noted, "[t]he evaluation of whether a taking has occurred is essentially a factual inquiry, which . . . [therefore] calls 'as much for the exercise of judgment as for the application of logic.'" *Sadowsky,* at 317 (*citing Andrus v. Allard,* 444 U.S. 51, 65 (1979)). As might be expected, then, "[t]here is . . . no precise rule as to when there has been a taking, and the inquiry involves a weighing of public and private interests." *Id.* There are, however, several factors that the Supreme Court has identified as bearing on the "justice and fairness" of the alleged taking. *Andrus*, 444 U.S. 51 at 65.

"The factors accorded particular significance in this inquiry are: (1) '[t]he economic impact of the regulation on the claimant and, particularly, (2) the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3)

'the character of the governmental action.'" *Sadowsky,* at 317 (quoting *Penn Central,* 438 U.S. at 124); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984). The application of these factors is "informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo*, 533 U.S. 606, 617-18 (2001) (*quoting Armstrong v. United States,* 364 U.S. 40, 49 (1960)). The Second Circuit has held that failure to establish any single factor may be sufficient grounds for dismissal. *See, e.g., Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (finding that plaintiff's regulatory claim fails because no reasonable investment-backed expectation could be established, and noting that, therefore, the court "need go no further in [its] analysis".). The Court will consider the factors in order.

The first issue is the economic impact of the refund procedure on plaintiffs. As noted, plaintiffs allege that they can only obtain a refund for discontinued tokens by traveling to Manhattan, whether by paying the $2.00 subway fare, by driving, or in some other manner. Thus, the actual economic impact of the procedure – if any – is necessarily limited to the cost of travel. This cost is not only *de minimis*, it is impossible to quantify, depending as it does on several factors, including the chosen means of travel, and the distance traveled. In any case, courts "uniformly reject the proposition that diminution of property value" is grounds for a regulatory taking, which, because plaintiffs agree that a refund is available, is their best case. *Penn Central,* 438 U.S. at 131.

Although the Court need go no further in its analysis, it will also consider whether plaintiffs have investment-backed expectations in the refund procedure. According to the Second Circuit, "the purpose of the investment-backed expectation requirement is to limit recover to [property holders] 'who could demonstrate that they bought their property in

reliance on a state of affairs that did not include the challenged regulatory regime."

*Cuomo*, 100 F.3d 253, 262 (*quoting Loveladies Harbor v. United States*, 28 F.3d 1171,

1177 (Fed. Cir. 1994)).  Here, the refund procedure appears unchanged in material

respects from the procedure in place prior to the discontinuance of tokens in 2003.  In any

event, plaintiffs do not allege that they purchased tokens at a point in time when the

refund procedure was either substantially different, or not in existence.  Thus, as a matter

of logic, it is simply not possible that plaintiffs had a "reasonable investment-backed

expectation" – or for that matter any sort of expectation – that was interfered with by the

refund procedure.  *See also Ruckelshaus* at 1006-07 (chemical produced had no

reasonable expectation that trade secrets would not be used and disclosed by the

government after the date of enactment of a federal statute that provided from that use

and disclosure).

Having considered the facts at issue here, and having applied the "factors

accorded particular significance" to the regulatory taking analysis by the Supreme Court,

*Sadowsky*, at 317, the Court concludes that plaintiffs have failed as a matter of law to

allege a Fifth Amendment taking for this second reason.

## B.  Plaintiffs' Motion to Amend the Complaint

Courts should grant leave to amend a complaint unless amendment would be futile or

another valid ground for denial exists.  *Ronzani v. Sanofi, S.A.,* 899 F.2d 195, 198 (2d

Cir. 1990).  In this case, plaintiffs' motion to amend is premised on the justiciability of a

Fourteenth Amendment claim that the refund procedure is unduly "onerous".  In support

of this claim, plaintiffs rely on *Kraebel v. New York City Dep't of Hous. Preservation &

Dev.,* 959 F.2d 395 (2d Cir. 1992), arguing that if "a factual inquiry[] determine[d] [that]

the burdens and delays imposed by the city in the [refund procedure]" were unreasonable, a due process claim would lie. (Opp., pp. 24-25). That is simply not the case.

In *Kraebel*, the Second Circuit held that the claimant-landlord had a protected property interest in the right to certain rental reimbursements for senior tenants that were provided for by statute. *Kraebel*, at 404. Only after reaching the conclusion that there was a statutory basis for plaintiff's alleged property right did the court proceeded to ask whether the claimant had been afforded due process. Here, as in *Kraebel*, plaintiffs must demonstrate they were deprived of a protected property interest to proceed with a Fourteenth Amendment due process claim. As discussed, *supra*, they cannot do so. Accordingly, plaintiffs' motion to amend is denied as futile. *See Acito v. IMCERA Group, Inc.* 47 F.3d 47, 54- 55 (2d Cir.1995) (amendment of the complaint is futile where it would fail to cure the deficiencies of the original complaint); *see also Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) (amendment futile where it would not survive a subsequent motion to dismiss).

## III.    Conclusion

Wherever the line between constitutional contract entitlements and other, mere "commercial contracts", it is clear – at least under the prevailing law in this Circuit – that the property interest claimed by plaintiffs in this case is not among those protected by the Fifth or Fourteenth Amendments. Rather, plaintiffs' remedy – if one exists at all – lies in state court, whether for breach of contract or, as plaintiffs' have alleged here, for "money had and received".[14] Although New York courts are admittedly reluctant to "embroil the

---

[14] Money had and received is an equitable cause of action premised upon unjust enrichment, and is therefore founded not on a contract or agreement but, rather, on "an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [the party] ought not to retain and that belongs to another." *Parsa v. State of New York,* 64 N.Y.2d 143, 148 (N.Y. 1984).

judiciary in the management and operation of the New York City Transit System",

*McKechnie v. New York City Transit Police Dept.,* 130 A.D.2d 466, 468 (citation and

quotation marks omitted), and therefore may deny plaintiffs' claims, it is no answer to

force the claim into ill-fitted constitutional clothing.  Accordingly, defendant's motion for

judgment on the pleadings [6] is granted, and plaintiffs' motion to amend their complaint

[10] is denied.   The Court declines to exercise jurisdiction over plaintiffs' remaining

state law claims.


Dated: New York, New York
       April 12, 2005

                                  _____

                                    Richard J. Holwell
                              United States District Judge

judiciary in the management and operation of the New York City Transit System",
*McKechnie v. New York City Transit Police Dept.,* 130 A.D.2d 466, 468 (citation and
quotation marks omitted), and therefore may deny plaintiffs' claims, it is no answer to
force the claim into ill-fitted constitutional clothing. Accordingly, defendant's motion for
judgment on the pleadings [6] is granted, and plaintiffs' motion to amend their complaint
[10] is denied. The Court declines to exercise jurisdiction over plaintiffs' remaining
state law claims.

Dated: New York, New York
     April 12, 2005

                                    Richard J. Holwell
                             United States District Judge